**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | |
|---|---|
| STAN  DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. CV-04-PT-3358-M |
| | ) |
| STATE  FARM  INSURANCE, d/b/a | ) |
| STATE  FARM  FIRE  &  CASUALTY | ) |
| COMPANY, and/or STATE  FARM | ) |
| AUTO  INSURANCE, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM  OPINION**

This cause comes on to be heard upon defendant State Farm Mutual Automobile

Insurance Company's[1] Motion for Summary Judgment, filed on May 13, 2005, and Motion to

Dismiss Municipal Defendants and Renewed Motion for Partial Dismissal, filed on May 27,

2005.

**FACTS[2] AND PROCEDURAL HISTORY**

Plaintiff Stan Davis ("Davis") is a resident of Marshall County, Alabama.  (Cmpt. ¶ 1).

Defendant State Farm Mutual Automobile Insurance Company ("State Farm") is an Illinois

corporation with its principal place of business in Bloomington, Illinois.  (Notice of Removal ¶

3).  State Farm does business in Marshall County.  (Cmpt. ¶ 2).

---

[1] Defendant states that it was erroneously named in the Complaint as "State Farm
Insurance," "State Farm Fire and Casualty," and "State Farm Auto Insurance."  According to
defendant, its proper name is State Farm Mutual Automobile Insurance Company.

[2] The court notes where "facts" appear disputed.

According to State Farm[3], in September 2003, Joseph T. Adams ("Adams") purchased a 1998 Ford F150 pickup truck (VIN: 2FTZF08W6WCA09270).  The truck was insured by State Farm under policy number 0695-028-01A.  According to a claim record submitted by State Farm, on or about February 26, 2004, Adams sold the truck to an individual who identified himself as Michael Adams.  (hereinafter referred to as "perpetrator").  Adams sold the truck to the perpetrator in exchange for what appeared to be a cashier's check in the amount of $10,900.  Adams deposited the check on or about February 27, 2004, but was later notified by his bank that the check had been returned as a fraudulent instrument.

On or about March 3, 2004, Adams reported to the authorities that the vehicle had been stolen, and submitted a claim to State Farm for the total theft loss of the vehicle.[4]  A Bill of Sale submitted by State Farm shows that on or about March 25, 2004, State Farm paid Adams the amount of $11,121.43 in settlement of his total theft loss claim.  In exchange for the payment, Adams executed and gave State Farm a Bill of Sale by which he transferred and assigned all his "rights, title, and interest" in the vehicle to State Farm.  Adams also executed a Secured Power of Attorney, authorizing State Farm to obtain a replacement certificate of title on the vehicle when recovered.  On March 26, State Farm sent a letter, notifying the authorities of its settlement with

---

[3] In his Response to State Farm's Motion for Summary Judgment, Davis stated that, "[f]or the most part," he does not disagree with State Farm's version of the facts.

[4] State Farm's activity log on the claim indicates that, on March 24, 2004, Adams informed the company that he had given the perpetrator the title documentation on the truck.  The activity log also indicates that State Farm became aware that Davis had applied for a Title for the truck on March 24, 2004.  On March 26, 2004, the activity log states in part:

> NI GAVE TITLE TO PERSON WHO STOLE THE VEHICLE AS HE
> THOUGHT HE WAS SELLING IT TO THEM.  THEREFORE WE ARE
> UNABLE TO APPLY FOR A REPLACEMENT TITLE AT THIS TIME . . .

its insured and its resulting ownership of the vehicle.

Davis testified that he located the truck through a March 6, 2004 listing in the Classified section of the *Gadsden Times*. (Davis Depo., pp. 28-30). The truck was listed for $6,500. Davis called the telephone number listed in the ad and spoke with the seller, who identified himself as "J.T. Adams." (Davis Depo., pp. 36-37). The seller confirmed during this conversation that he was selling the truck for $6,500. (*Id.* at p. 40).

During this conversation, the seller stated that the truck previously belonged to his brother, who was serving in the military in Iraq. (Davis Depo., p. 36). The seller further stated that he had finished paying off the truck for his brother, and that he had decided to sell it. (*Id.* at 40-41). Davis did not ask the seller how the seller's brother had sold him the truck from Iraq. (*Id.* at p. 66).

Davis met the seller at BancorpSouth in Albertville on March 8, 2004. (Davis Depo., p. 42). After inspecting the truck, Davis and the seller drove the truck to B&B Automotive in Albertville, so that a friend of Davis' could inspect the truck for bodywork. (*Id.* at pp. 43-45). Employees of B&B Automotive told Davis that the truck had had minor paint work on the passenger door, but had not been in a serious wreck. (*Id.* at p. 43). Davis testified that he thought $6,500 for the truck was a "good price." (*Id.* at p. 108-09). He stated that he took the truck to B&B Automotive because he thought the truck might have previously been in a wreck because of the low asking price. (*Id.*)[5]

_____

[5] In his Response to State Farm's Motion for Summary Judgment, Davis points out that State Farm's activity log on the claim involving the truck indicates $7,825.00 as one possible value for the truck. The activity log for March 23, 2004 states in pertinent part:

REVIEWED FILE TO DETERMINE VALUE. PER NADA, AVERAGE

Davis purchased the truck on March 8, 2004 for $6,500.  (Davis Depo., pp. 48, 56-57).
Davis offered the seller a cashier's check.  (*Id.* at p. 55).  However, the seller stated that he
preferred cash, and Davis paid for the truck in cash.  (*Id.* at pp. 55-56).  At the time of the
purchase, Davis presented the seller with a blank Bill of Sale.  (*Id.* at pp. 59-60).  The seller
wrote in print "J.T. Adams" in the space reserved for the seller's signature.  (*Id.* at p. 60).  Davis
later completed the remaining entries on the Bill of Sale.[6]  (*Id.*)  The seller told Davis that he did
not want a copy of the Bill of Sale.  (*Id.* at p. 110).

Also during the transaction, the seller gave Davis title documentation on the truck.
(Davis Depo., p. 63-64).  Davis acknowledge that the back of the title document was already
signed, and that the seller did not sign it in his presence.  (*Id.* at p. 64).  Besides the seller's
signature, the back of the title had not been filled out.  (*Id.* at pp. 64-65).

Davis testified that he compared the handwriting on the Bill of Sale to the handwriting on
the back of the title document.  (Davis Depo., pp. 64, 99-100).  Davis stated that he believed the
handwriting on the back of the title "matched" the handwriting on the Bill of Sale.  (*Id.*)  The
signature on the Bill of Sale appeared as follows:

---

RETAIL VALUE ON THE STOLEN VEHICLE IS $7825.  HOWEVER DID
MARKET SEARCH USING AUTOTRADER AND FOUND SEVERAL
VEHICLES SOLD FOR SIGNIFICANTLY MORE THAN WHAT NADA
INDICATES.  OF THE VEHICLES WITH SIMILAR MILEAGE AND
OPTIONS AS THE STOLEN VEHICLE THE AVERAGE SELL PRICE IS
$10,837.66.  PLUS TAX AND TITLE LESS DEDUCTIBLE ACV IS $11,121.43.

[6] Davis entered $4,000 as the price he paid for the truck on the Bill of Sale.  (Davis
Depo., p. 62).  Davis admitted that he paid $6,500 for the truck and that he entered the lesser
amount to save money on taxes.  (*Id.* at pp. 62-63).

_J. T. Adams_
**Seller's Signature**

A copy of the signature on the back of the Certificate of Title is presented below:



[7]

---

[7] The seller's name is printed below his signature on the back of the Certificate of Title, as shown below:



It is unclear from Davis' testimony whether the printed seller's name was on the Title when he received it or whether Davis added the printed name later.  Davis testified as follows:

> Q:      Okay.  Did he complete the odometer statement on the reverse of that title document?
> A:      No, sir.  Matter of fact, that was – it turned out it was open title on the truck.  Mr. Adams had made open title, didn't have anything filled in but the seller's name.
> Q:      So is it your testimony that the reverse of that title document he gave you was blank when he gave it to you?
> A:      Except for the signature.
> Q:      Except for that name, J.T. Adams?
> A:      Uh-huh. . . .

(Davis Depo., pp. 64-65).

> Q:      And he gave you a blank title?
> A:      He gave me a title signed on the back J.T. Adams.  It didn't have the – the other part wasn't filled out like the normal process.  I signed my name to it

5

The seller told Davis, during their phone conversation on March 6, 2004, that he lived in Gadsden, Alabama. (Davis Depo., pp. 37, 109). However, the Certificate of Title that the seller tendered to Davis at the point of sale, which reflected an issue date of December 30, 2003, showed that "Joseph T. Adams" lived in Montevallo, Alabama. Davis testified that he did not request that the seller produce a diver's license or other identification in order to verify the seller's identity. (Davis Depo., p. 65). There was no evidence on the title document that reflected the seller's alleged purchase of the truck from his brother in Iraq. (*Id.* at p. 66). Davis also did not request that the seller produce a power of attorney or other documentation demonstrating the seller's authority to sell the truck. (*Id.* at p. 67). Davis did not do anything to check the state of the title on the truck before purchasing it. (*Id.* at p. 51). Further, the seller did not deliver a tag receipt to Davis during the sale of the truck, nor was such a receipt in the truck at the time of the purchase. (*Id.* at pp. 67-68).

Following the sale, Davis purchased insurance, registered the truck at the Marshall County Courthouse, and completed a title application. (Davis Depo., p. 69). Davis was informed at that time that the tag on the truck had expired. (*Id.* at pp. 73-74). Davis paid accrued taxes and a penalty for the expired tag. (*Id.*)

On March 29, 2004, officers from the Albertville Police Department visited Davis' home and seized the truck. (Davis Depo., pp. 80-82). At that time, the officers informed Davis that the truck had been reported stolen in Montevallo. (*Id.* at p. 81). The officers further informed Davis that State Farm had paid Adams for the truck and that State Farm owned the truck. (*Id.* at pp. 81-

---

as buyer and all that when I carried it to the courthouse.

(*Id.* at p. 111).

6

82).  The officers did not threaten to place Davis under arrest at the time of the seizure.  (*Id.* at p. 89).  Davis further testified that the officers did not assault or lay hands on him.  (*Id.* at p. 93).  The officers did not use curse words, rough language, or disparage Davis in any way.  (*Id.*)  Davis stated that the officers were "nice."  (*Id.*)

According to his testimony, Davis has no knowledge of any contact or coordination between anyone at the Albertville Police Department and State Farm.  (Davis Depo., p. 95).  Davis spoke with a representative of State Farm on two occasions after the seizure.  (*Id.* at pp. 89-90, 92).  State Farm's representatives were never abusive to Davis.  (*Id.* at p. 92).  Nor did they threaten Davis in any way.  (*Id.*)  Davis testified that he didn't see anything wrong with the sale event considering all the circumstances.  (*Id.* at p. 122).

On October 20, 2004, Davis filed the present action in the Circuit Court of Marshall County, Alabama.  Davis' Complaint alleges that the Albertville Police Officers acted as State Farm's agents, and that their actions constitute "outrageous conversion of Plaintiff's property . . . without due process of law."  (Cmpt. ¶ 6).  Paragraph 7 of the Complaint states as follows:

> That the conduct of converting the property of the Plaintiff by State Farm Insurance and it's agents (the Police Officers) violated the Plaintiff's rights under the 5th and 14th Amendment(s) to the Constitution of the United States, and the Constitution of Alabama (1901).

Unnumbered paragraph 8 of the Complaint further alleges:

> That said provisions of the named Constitutions were established as a protection for the private citizen against a governmental taking of property without first affording that citizen due process as provided by law.  That the acts of State Farm Insurance, by and through it's (*sic*) agents (the Police Officers) was an act of outrageous conduct which is prohibited by constitutional protections, and therefore, acts that will not be tolerated by our modern society, and which must be punished in order that the same or similar acts do not re-occur in the future.  That the Plaintiff hereby demands Five Hundred Thousand ($500,000.00) Dollars as

punitive damages against State Farm Insurance.

In addition to the punitive damages requested, plaintiff also seeks $10,000.00 in compensatory damages.  (*Id.* at ¶ 9).

State Farm removed the action to this court on December 1, 2004 on the basis of diversity jurisdiction.  Also on December 1, 2004, State Farm filed a Motion for Partial Dismissal, arguing that paragraph 7 and unnumbered paragraph 8 of the Complaint fail to state a claim for which relief can be granted.  State Farm argued, in that Motion, that the Complaint fails to state a claim under § 1983 because Davis had not named as defendants the City of Albertville, the Albertville Police Department, or any officers of the department.  Neither, State Farm asserted, had Davis claimed that the alleged violation of his constitutional rights was committed pursuant to any official policy, statute, custom, rule, ordinance, or practice of a city, county or state governmental entity.  Finally, State Farm contended, Davis failed to allege that State Farm is a "state actor" or that it acted "under color of state law."

In response to the Motion for Partial Dismissal, Davis filed an Amended Complaint on January 19, 2005.  The Amended Complaint named as additional defendants the City of Albertville, Alabama, and police officers Dwight Lawrence and Chad Miller.  The Amended Complaint added the following allegations:

> That on March 29, 2004, Officers Dwight Lawrence and Chad Miller, while on duty with the Albertville Police Department, under the color of State Law, by using their authority as Police Officers, and at the direction and request of the Defendant State Farm, took and removed said vehicle from the possession of the Plaintiff, without his permission and against his rights of possession and ownership.  That said conduct of removing and taking the property of the plaintiff, violated the Plaintiff's right of Due Process as guaranteed by the Constitution of the United States of America, and as guaranteed by the Constitution of the State of Alabama.

8

> That said conduct of taking the property of the Plaintiff violates the Plaintiff's
> right pursuant to 42 U.S.C. § 1983, Civil Rights Act 1871, 5th Amendment and
> 14th Amendment to the Constitution of the United States of America, which that
> citizens shall not be de[p]rived of their property without "Due Process of Law."

(Amd. Cmpt. ¶¶ 15-16).

On May 27, 2005, State Farm filed a Motion to Dismiss Municipal Defendants, claiming

that over 120 days had elapsed since Davis filed the Amended Complaint and Davis had not

served, or attempted to serve, the City of Albertville, Lawrence, or Miller.  This Motion further

Renewed State Farm's arguments for dismissal put forth in its Motion for Partial Dismissal filed

on December 1, 2004.

On June 3, 2005, Davis filed a response to State Farm's May 27, 2005 Motion to

Dismiss.  In that response, Davis stated as follows:

> That at this time the Plaintiff is of the opinion that [the § 1983] claim will not be
> successful, and as opposed to serving the Municipal Defendants and causing them
> unnecessary expense, offers no opposition to the motion of the Defendant, State
> Farm.
>
> That the related § 1983 claim against the Defendant State Farm should also be
> dismissed, and that portion of the Plaintiff's Response to the Defendant's Motion
> for Summary Judgement relative only to the § 1983 claim should as well be
> stricken, and that the Defendant State Farm is entitled to Summary Judgment as to
> that claim only.

(Plaintiff's Response to Defendant State Farm's Motion to Dismiss Municipal Defendants ¶¶ 1-

2).[8]

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

---

[8] As Davis has withdrawn his § 1983 claim, the court does not discuss the arguments for
and in opposition to summary judgment on that claim.  Instead the court focuses on the parties
arguments regarding Davis' conversion and outrage claims.

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

ARGUMENTS[9]

I.      **State Farm's Motion for Summary Judgment.**

      A.      **Davis' Conversion Claim Fails Because He Did Not Hold General or Special Title on the Truck.**

      State Farm argues that, under Alabama law, the tort of conversion is the wrongful taking or wrongful detention or interference, illegal assumption of ownership, or illegal use or misuse of another's personal property. *Ex parte Anderson,* 867 So.2d 1125, 1129 (Ala. 2003); *Crown Life Ins. Co. v. Smith,* 657 So.2d 821, 823 (Ala. 1994). Acc0ording to State Farm, in order to bring an action for conversion, the plaintiff must have had: (1) general or special title to the property; and (2) possession or an immediate right of possession of the property at the time of the conversion. *Ex parte Anderson,* 867 So.2d at 1132; *City Car Sales, Inc. v. McAlpin*, 380 So.2d 865, 868 (Ala. Civ. App. 1979). State Farm maintains that, while Davis had possession of the vehicle, he held void or no title on the truck. State Farm argues that, because Davis did not hold general or special title to the truck, his conversion claims are due to be dismissed.

      1.      **Adams' March 3, 2004 Report of Vehicle Theft to the Montevallo Police Department Voided Title on the Truck.**

      State Farm notes that Adams sold the truck to the perpetrator on or about February 26, 2004. He learned from his bank that the perpetrator's cashier's check was a fraudulent instrument on or about March 3, 2004. According to State Farm, Adams immediately informed the Montevallo Police Department of the theft. At that time, State Farm maintains, the Montevallo Police Department was required to report the theft to the Alabama Department of

---

      [9] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

Revenue.[10]

Upon a report of theft or conversion of a vehicle, State Farm asserts, the Department of Revenue is prohibited from issuing title to such vehicle.  State Farm highlights Code of Alabama § 32-8-84(e) (1975), which states:

> The department may suspend the registration of a vehicle whose theft or conversion is reported to it pursuant to this section; until the department learns of its recovery or that the report of its theft or conversion was erroneous, it shall not issue a certificate of title for the vehicle.

Given this statute, State Farm argues, Adams' report of the theft invalidated any subsequent attempt to change or convert title on the truck.  Thus, State Farm asserts, as of March 3, 2004, title to the truck could not be legally transferred.  State Farm notes that the perpetrator sold the truck to Davis on March 8, 2004.  Pursuant to § 32-8-84(e), State Farm concludes, Davis could not receive marketable title to the truck on March 8, 2004, as such title had been voided five days earlier.  Accordingly, State Farm contends, Davis could not hold general or special title to the truck and his conversion claim must fail.[11]

_____

[10] In support of this proposition, State Farm cites to § 32-8-84(a) of the Alabama Code (1975), which states:

> A peace officer who learns of the theft of a vehicle not since recovered or of the recovery of a vehicle whose theft or conversion he knows or has reason to believe has been reported to the department shall forthwith report the theft or recovery to the [Department of Revenue].

[11] State Farm acknowledges that Davis attached to his complaint a Certificate of Title which was issued by the Alabama Department of Revenue on April 23, 2004.  According to State Farm, after the truck was recovered from Davis on March 29, 2004, it was removed from the NCID database.  State Farm has produced a certified April 7, 2004 Memorandum produced by the Alabama Department of Revenue, which indicates this removal.  Because the vehicle was no longer reported as stolen, State Farm states, the revenue department apparently processed Davis' pre-seizure title application.  State Farm contends that, at the time of the alleged conversion by

### 2.   The Fact That the Perpetrator Held "Voidable" Title from February 26 Through March 3, 2004 Is Inconsequential.

State Farm notes that Davis' complaint cites *Hodges Wholesale Cars v. Auto Dealer's Exchange of Birmingham,* 628 So.2d 608 (Ala. 1993) in support of his contention that the perpetrator received "voidable" title from Adams during the February 26, 2004 sale of the truck by fraudulent artifice.  Davis further contends that, when the perpetrator sold the truck to him on March 8, 2004, he received clear title because he was a "good faith purchaser for value," as defined by Alabama Code § 7-2-403[12] (1975) and its progeny.

---

State Farm, Davis did not possess title to the truck in his name, nor could he under § 32-8-84(e). Thus, State Farm concludes, Davis' receipt and possession of a title certificate, which was mistakenly issued by the revenue department on April 23, 2004, is wholly immaterial to the court's assessments of Davis' claims in this matter.  Furthermore, State Farm argues, the April 23 title certificate issued to Davis is subject to revocation pursuant to § 32-8-49(a) of the Code of Alabama (1975), which states:

> The department shall suspend or revoke a certificate of title, subject to the appeal provisions of Chapter 2A of Title 40, when authorized by any other provision of law or if it finds:

> (1) The certificate of title was fraudulently procured or erroneously issued . . .

[12] Alabama Code § 7-2-403(1) states:

> (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:

>> (a) The transferor was deceived as to the identity of the purchaser, or
>> (b) The delivery was in exchange for a check which is later dishonored, or
>> (c) It was agreed that the transaction was to be a "cash sale," or
>> (d) The delivery was procured through fraud punishable as larcenous under the criminal law.

13

State Farm agrees that the February 26, 2004, sale between Adams and the perpetrator falls within the ambit of § 7-2-403(1)(b) and/or (d).  Thus, State Farm acknowledges, voidable title was passed from Adams to the perpetrator on February 26, 2004.  Furthermore, State Farm agrees that the perpetrator held voidable title on the truck from February 26 through March 3, 2004.  However, State Farm argues, on March 3, the voidable title held by the thief was rendered void by Adams' report of the vehicle's theft to the Montevallo Police Department.  *See* Ala. Code § 32-8-84(e) (1975) (preventing Department of Revenue from issuing certificate of title for vehicles reported stolen).  Thus, State Farm argues, void, not voidable, title was passed from the perpetrator to Davis on March 8, 2004.  Accordingly, State Farm concludes, Davis is not entitled to claim the protections afforded to purchasers under § 7-2-403 for the March 8, 2004 transaction.  *See Jones v. State Farm Mut. Auto. Ins. Co.,* 679 So.2d 1114, 1116 (Ala. Civ. App. 1996) (affirming summary judgment in favor of insurer on conversion claim when insurer paid theft loss claim on the car and received the original title before the car was later purchased by the plaintiff); *City Car Sales, Inc. v. McAlpin,* 380 So.2d 865, 868-69 (Ala. Civ. App. 1979) (affirming summary judgment for insurer on conversion claim; finding that insurer produced the only evidence of an unbroken chain of title to the original owner of the vehicle).

State Farm further points to *B.R.L. Equipment Rentals Ltd. v. Seabring Marine,* 168 F.3d 413 (11th Cir. 1999), to support its contention that the voidable title held by the perpetrator was voided by Adams before such title was transferred to Davis.  In *Seabring*, Seabring Marine Industries, a Florida corporation, sold eleven boats to Bridge Bay Marina, a retailer located in British Columbia.  168 F.3d at 414.  Bridge Bay paid for the boats with company checks.  *Id.* Each Bridge Bay check was subsequently returned because of insufficient funds.  *Id.*  Seabring

14

eventually repossessed all of the boats, including three boats that had been sold by Bridge Bay to third parties. *Id.* These third parties brought suit against Seabring for conversion of the three boats sold to them by Bridge Bay. *Id.*

State Farm asserts that, similar to Alabama Code § 7-2-403, British Columbia law protected third party purchasers who, in good faith, purchased property from a seller who held voidable title. *Id.* at 416 (citing R.S.B.C. ch. 410, § 28 (1996)). However, Seabring argued that Bridge Bay's title had been voided at the time of the sale from Bridge Bay to the third party purchasers. *Id.* at 416. Therefore, Seabring contended that the third party purchasers could not take clean title to the boats from Bridge Bay. *Id.* In its analysis of Seabring's argument, the Court stated, in part:

> There do not appear to be any British Columbian cases addressing the question of what constitutes avoidance of a voidable title; indeed, there appears to be very little case law anywhere on the topic. However, because voidable title is exactly the same as ordinary title--with the exception of the remedies available to the transferor of that title--<u>voidable title can presumably be avoided in the same ways in which ordinary title can be passed, namely, through voluntary relinquishment, legal action, or repossession.</u>

*Id.* (emphasis added).

While the *Seabring* court found that Seabring had not voided the voidable title held by Bridge Bay before the sale of the three boats to the third party purchasers, State Farm contends, the case provides direction as to the proper analysis of how and when voidable title can be voided. *Id.* Specifically, State Farm argues, the Eleventh Circuit gave directions that one should look at the applicable state law that dictates how title is voided. *Id.* According to State Farm, if the state's requirements to void title are met before voidable title is passed to a good faith purchaser, then such purchaser cannot claim protection under the U.C.C.

As discussed above, State Farm notes that Alabama law requires that a theft or conversion be reported to the Department of Revenue.  *See* Ala. Code § 32-8-84(a) (1975).  Once such a report is made, State Farm maintains, title is voided and rendered unmarketable.  *See* Ala. Code § 32-8-84(e) (1975).  In this case, State Farm points out, the report of the vehicle theft was made on March 3, 2004.  According to State Farm, the voidable title held by the perpetrator on the truck was voided and rendered unmarketable on this date.  Therefore, State Farm concludes, void title was passed to Davis as part of the March 8, 2004 transaction.  Accordingly, State Farm asserts, Davis is not entitled to enjoy the protections provided by § 7-2-403, and his conversion claim is due to be dismissed.

### 3.    Davis Was Not a Good Faith Purchaser.

Assuming, *arguendo*, that the perpetrator held voidable title to the truck at the time of the truck's sale to Davis, State Farm states, Davis is still not entitled to enjoy the protections of  § 7-2-403, because he did not act in good faith when he purchased the truck.  Section 7-2-403(1) states, in part, that "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value."  State Farm notes that "good faith" is defined as "honesty in fact in the conduct or transaction concerned."  Ala. Code § 7-1-201(b)(20) (1975).

According to State Farm, the evidence shows that Davis did not act with the requisite honesty in fact.  State Farm highlights the following evidence.

•     The classified ad by which Davis discovered the truck showed an asking price of $6,500.  The ad immediately below the ad for this truck showed a truck of comparable make and model for $12,900.  Davis understood that this truck was priced lower than comparable vehicles when he bought it.

•     Davis testified that he thought the seller had bought the truck from his brother who had been deployed to Iraq.  Davis did not ask the seller how the seller's brother had sold him

16

the truck from the Middle East.  Davis did not request that the seller produce a driver's license or other identification in order to verify the seller's identity.  Nor did Davis request that the seller produce a power of attorney or other evidence showing that he had authority to sell the truck.

•     Davis testified that the low price on the truck led him to believe that it may have been wrecked.  Davis took the truck to an automotive repair shop to be looked over before he bought the truck.  The employees at the shop examined the truck and told Davis that it had never been badly wrecked.[13]

•     While Davis testified that he has negotiated the price on vehicles in the past, he did not negotiate the price on the truck.

•     Davis offered to give the seller a cashier's check in the amount of the purchase price.  The seller expressed a preference for cash, and Davis paid him $6,500.00 cash for the truck.  Davis testified that he had never bought a car from someone who refused a cashier's check.[14]

•     Davis obtained a blank Bill of Sale form from his banker at the time of the sale.  The seller wrote on the seller's signature line in print letters (not cursive) "J.T. Adams," and told Davis he could fill out the rest of the form however he liked.  The seller did not want a copy of the Bill of Sale.

•     The title document given to Davis by the seller was already signed.  Davis did not witness the seller sign the rear of the title document.  Davis testified that, other than the seller's

---

[13] State Farm argues that this evidence shows that the sole basis on which Davis justified the low price was discredited before Davis purchased the vehicle.

[14] Concerning the method of payment issue, Davis testified as follows:

> Q:     What did you think when he said no, I want cash and not a cashier's check?  Did you think that was odd?
> A:     Not really.
> Q:     Have you ever had anyone else that you dealt with in buying or selling a car refuse a cashier's check?
> A:     Not really, but I don't know that – he didn't say I'll refuse it.  He just said I would prefer cash.
> Q:     Okay.
> A:     So no, I didn't think anything out of the ordinary about it.  I've paid cash and so forth for cars before.

(Davis Depo., p. 56).

name, the back of the title was blank.  Davis subsequently completed the remainder of the document.  Davis acknowledged that, although he paid $6,500.00 for the truck, he indicated on the Bill of Sale that he paid only $4,000.00 in order to save on his taxes.

- Davis testified that he compared the handwriting on the Bill of Sale to the handwriting on the rear of the title document.  Davis stated that he believed the handwriting on both documents matched.  However, the signature on the title was in cursive, while the signature on the Bill of Sale was in print.

- The seller told Davis that he lived in Gadsden, but the Certificate of Title that the seller tendered to Davis showed that Adams lived in Montevallo, Alabama.

- Davis testified that there were no tag receipts, service records or other materials, besides the truck's original price sticker, in the glove box.  The seller did not deliver a tag receipt to Davis during the sale of the truck.

- Upon registering the car in his name following the purchase, the revenue agent told Davis that the tag on the truck had expired more than three months earlier.  Davis had to pay additional accrued taxes and a penalty for the expired tag.

State Farm notes that Davis testified that he has owned approximately 20 vehicles in his lifetime, about half of which he purchased used.  (Davis Depo., p. 23).  According to State Farm, the numerous discrepancies highlighted above show that Davis' actions and/or inactions were not in line with "honesty in fact in the conduct or transaction."  Ala.Code § 7-1-201(b)(20) (1975).  Because Davis did not act in "good faith" during his purchase of the truck, State Farm asserts, he does not qualify as a "good faith purchaser for value," as required by § 7-2-403(1).  Thus, State Farm concludes, even if the seller held voidable title at the time that he sold the truck to Davis, Davis would still not be entitled to the protections of § 7-2-403.

**B.    State Farm Is Entitled to Judgment as a Matter of Law on Davis' Outrage Claim.**

State Farm notes that Davis' Complaint alleges that State Farm's conduct regarding the removal of the truck from Davis' possession was "outrageous."  State Farm maintains that such

18

claims are due to be dismissed as a matter of law.  State Farm highlights the following passage

from *Potts v. Hayes,* 771 So.2d 462 (Ala. 2000):

> "The emotional distress [caused by the defendant's conduct] must be so severe
> that no reasonable person could be expected to endure it. Any recovery must be
> reasonable and justified under the circumstances, liability ensuing only when the
> conduct is extreme. Comment, *Restatement* [ *(Second) of Torts*], at 78. By
> extreme we refer to conduct so outrageous in character and so extreme in degree
> as to go beyond all possible bounds of decency, and to be regarded as atrocious
> and utterly intolerable in a civilized society. [Cmt. d], *Restatement*, supra at 72."

771 So.2d at 465 (per curiam) (quotation marks and bracketed text in original) (quoting

*American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1981)).

State Farm notes that, in *Potts*, the Alabama Supreme Court observed that the tort of

outrage "is an extremely limited cause of action."  *Id.* at 365.  Further, State Farm asserts, the tort

of outrage is so limited that the Alabama Supreme Court has recognized it only when presented

in connection with three kinds of conduct: "(1) wrongful conduct in the family-burial context . . .

; (2) barbaric methods employed to coerce an insurance settlement . . . ; and (3) egregious sexual

harassment . . ." *Id.* (internal citations omitted).  According to State Farm, the allegations in the

Complaint, as well as the undisputed facts, do not even remotely resemble any of the scenarios

under which the Alabama Supreme Court has recognized the tort of outrage.  Therefore, State

Farm concludes, Davis' outrage claims are due to be dismissed as a matter of law.

Notably, State Farm asserts, Davis testified that the Albertville police officers did not

threaten to place him under arrest.  Nor did they assault or disparage Davis, or use rough

language, at the time the truck was seized.  Similarly, State Farm notes, Davis testified that the

representative from State Farm with whom he spoke was never abusive or threatening to him in

any way.  State Farm maintains that this conduct falls far short of the "atrocious and utterly

intolerable" conduct necessary to support an outrage claim.  *Potts*, 771 So.2d at 465.

## II.     Plaintiff's Response.

### A.     Davis Did Hold Title to the Truck When It Was Taken from Him.

Davis agrees with State Farm that Alabama law requires that a plaintiff asserting a claim

for conversion show that he had either general or special title in the property, and that the

defendant wrongfully took possession, or wrongfully detained or interfered with his possession,

acquired illegal ownership, or acquired illegal use or misuse of the property.  *City Car Sales, Inc.*

*v. McAlpin*, 380 So.2d 865, 868 (Ala. Civ. App. 1979).  Davis also highlights the text of

Alabama Code § 7-2-403(1)(d) (1975), *see supra.*

Davis notes that Adams sold the truck to the perpetrator and gave the perpetrator an open

or in blank Alabama Certificate of Title based upon the belief that he was receiving a valid

cashier's check.  Davis argues that this created a voidable title held by the perpetrator.

According to Davis, under § 7-2-403(1)(d), the perpetrator had the power to transfer good title to

him, as a good faith purchaser who gave value for the truck.  Davis asserts that Adams was

negligent, or possibly criminal, in his conduct of issuing the open title.  Davis cites to §§ 32-8-

44(a) and 32-8-13(5) of the Code of Alabama (1975) to support this position.  Section 32-8-44(a)

states:

> If an owner transfers his interest in a vehicle, other than by the creation of a
> security interest, he <u>shall</u>, at the time of the delivery of the vehicle, execute an
> assignment and warranty of title to the transferee in the space provided therefor on
> the certificate or as the department prescribes, and cause the certificate and
> assignment to be mailed or delivered to the transferee or to the department.

(emphasis added).  Section 32-8-13(5) states: "A person is guilty of a misdemeanor who . . .

[w]illfully violates any other provision of this chapter, except as otherwise provided in this

chapter."

Given this language, Davis argues, Adams was in violation of § 32-8-44(a) when he issued the title in blank or in an open condition. Therefore, Davis concludes, Adams made the title voidable. Davis maintains that the voidable title was then transferred to him as good title pursuant to § 7-2-403.[15]

Davis draws the court's attention to *Hodges Wholesale Cars v. Auto Dealer's Exchange of Birmingham*, 628 So.2d 608 (Ala. 1993). According to Davis, the issues addressed by the *Hodges* court are nearly identical to those present here. In *Hodges*, the owner of the vehicle, Alexander, sold his car to an initial buyer, who paid with a check that was later returned because of insufficient funds. 628 So.2d at 609. Alexander issued the initial buyer a title to the vehicle signed in blank. *Id.* The initial buyer then sold the car to Express Drive Away. *Id.* The initial buyer did not reveal his true identity to Express Drive Away, but instead represented that he was Alexander. *Id.* This was possible because Alexander had issued the title in blank. *Id.* After several re-sales between dealers, the car was ultimately sold to DeLara. *Id.*

The *Hodges* court stated that "§ 7-2-403 . . . establishes that a party with only voidable title can pass good title to a third-party purchaser who acts in good faith." *Id.* at 610 (citing *Ledbetter v. Darwin-Dobbs Co.*, 473 So.2d. 197 (Ala. Civ. App. 1985)). The court further stated:

> It is undisputed that the original owner of the car, Alexander, intended to sell his car to the initial buyer (who subsequently sold the car to Express). Alexander was

---

[15] Davis takes issue with State Farm's reliance on *B.R.L. Equipment Rentals Ltd. v. Seabring Marine,* 168 F.3d 413 (11th Cir. 1999). According to Davis, the *Seabring* holding gives no particular guidance in this case, other than directing the parties to look at the applicable state law.

not deprived of his car by a physical taking of which he was unaware. Rather, it is undisputed that Alexander voluntarily delivered his car to the initial buyer and gave him the certificate of title, signing it in blank. It was not until later that Alexander discovered that the initial buyer had given him a check drawn on an account with insufficient funds.

Although the delivery of the car may have been procured through fraud, it was not a theft. "A thief who wrongfully takes goods is not a purchaser ⋯ but a swindler who fraudulently induces the victim to voluntarily deliver them is a purchaser⋯." *Jernigan v. Ham*, 691 S.W.2d 553, 556 (Tenn. App. 1984). Therefore, there was a "transaction of purchase" within the meaning of § 7-2-403, and the buyer had "voidable" title to the car. *Ledbetter, supra*; see also *American Std. Credit, Inc. v. National Cement Co.*, 643 F.2d 248 (5th Cir.1981) (the party who delivered the goods to the subsequent seller intended, however misguidedly, that the seller would become the owner of the goods); *CPI Oil & Ref., Inc. v. Metro Energy Co.*, 557 F.Supp. 958 (N.D. Ala. 1983) (the con artist who fraudulently induced a manufacturer to deliver goods to him by means of a forged check has voidable title because he obtained delivery through a transaction of purchase). *See also Charles Evans BMW, Inc. v. Williams*, 196 Ga. App. 230, 395 S.E.2d 650 (1990).

Because the initial buyer had voidable title to the car, rather than void title, he had the power to transfer good title to a good faith purchaser for value. Ala.Code 1975, § 7-2-403. *Ledbetter, supra*. Therefore, the next question is whether Express was a "good faith purchaser for value" and received good title to the car.

" 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Ala.Code 1975, § 7-2-103(1)(b). It is undisputed that Express acted in good faith when it purchased the car from the initial buyer. Express did not know, and had no reason to know, that the initial buyer's representations were false. The initial buyer held himself out to be Doyle Alexander, and the certificate of title to the car showed that Alexander was the owner. The certificate of title bore Alexander's unforged signature as seller. Express gave the initial buyer a check made payable to Doyle Alexander. There was no evidence presented to show that, in negotiating and consummating the purchase of the car, Express had been less than honest or had failed to observe reasonable commercial standards of fair dealing.

Based upon the undisputed evidence, we must conclude that Express was, as a matter of law, a good faith purchaser for value when it bought the car from the imposter. Express received good title to the car, which it conveyed to Cleveland at the auction conducted by Auto Exchange. Therefore, the trial court properly entered the summary judgments against Cleveland.

22

*Id.* at 610-11.

Similar to the situation in *Hodges*, Davis argues, here Adams' sale and transfer of the open title was a "transaction of purchase," which created voidable title in the initial buyer, which in turn sold the truck to Davis. Davis further maintains that he gave value for the truck and that he purchased it from the perpetrator in good faith. Davis contends that State Farm offers no legal authority to support their position that he did not act in good faith. According to Davis, State Farm is asking the court to enter into his mind and determine that the circumstances surrounding the sale caused him to realize that there was a problem with the transaction. Davis concludes that the issue of whether he acted in good faith is a question of fact to be determined by the jury, making summary judgment improper.

Davis contends that, once he purchased the truck as a good faith purchaser, his title was good. He also had possession of the truck, until the Albertville Police removed it. Davis notes that the vehicle was only located because he processed the transfer according to Alabama law.

Davis contests State Farm's argument that he did not have good title because Adams reported the vehicle stolen and his claim was paid by State Farm. According to Davis, State Farm has never acquired title to the Truck and, therefore, its claim of unbroken chain of title is without merit. Davis argues that, by the time State Farm settled the claim with Adams, he had already acquired good title from the perpetrator and was making an application for title in his name pursuant to Alabama law.

Davis maintains that *City Car Sales, Inc. v. McAlpin,* 380 So.2d 865 (Ala. Civ. App. 1979), does not support State Farm's position, as the facts in this case are different from those in

*City Car Sales*.[16]

**B.    The Conduct of State Farm Was Outrageous.**

Davis maintains that the conduct of State Farm was outrageous in nature.  Davis

acknowledges that the conduct does not specifically fit into the categories discussed in *Potts v.*

*Hayes,* 771 So.2d 462 (Ala. 2000).  However, Davis argues that the conduct did violate his

constitutional rights, and that there must be some protections afforded for such circumstances as

the ones involved here.

Davis argues that Alabama law is very clear that he obtained good title from the

perpetrator.  Despite this, Davis asserts, State Farm continued its efforts to recover the truck.

Davis notes that the Alabama Supreme Court has allowed punitive damages when a conversion is

---

[16]   The court in *City Car Sales* held that the insurance company had an unbroken title
from the original owner and was, therefore, entitled to summary judgment.  The court stated:

> McAlpin[, the plaintiff,] has not been able to show legal title at the time of the
> alleged conversion. American[, the insurance company,] introduced a certificate
> of title from Missouri showing an unbroken chain of title to the automobile from
> the original purchaser to American. It is understood that a certificate of title is
> only prima facie evidence of ownership, which can be contradicted by other
> evidence. *Case v. Universal Underwriters Insurance Co.*, 534 S.W.2d 635 (Mo.
> App. 1976); *Wielgorecki v. White*, 133 Ga. App. 834, 212 S.E.2d 480 (1975). See
> Alabama Code 1975, s 32-8-39(d). However, McAlpin's only evidence to support
> her claim of legal title in the automobile was a bill of sale from City[, the seller,]
> and a license registration from the state of Alabama. *But see, State Farm Mutual*
> *Automobile Insurance Co. v. General Mutual Insurance Co.*, 282 Ala. 212, 210
> So.2d 688 (1968). This evidence does not contradict American's certificate of title
> which indicates that the chain of title to the Cadillac is unbroken and that
> American is the present owner. McAlpin has not established legal title to the
> Cadillac and therefore cannot recover for conversion. We view the evidence as
> presenting no genuine issue of material fact. Therefore, we affirm the trial court's
> granting of American's motion for summary judgment.

380 So.2d at 868-69.

coupled with a knowing violation of the law.  *Roberson v. Ammons,* 477 So.2d 957, 961 (Ala. 1985) (stating, "punitive damages are justified when the evidence discloses the conversion to have been committed in known violation of law and of owner's rights, with circumstances of insult, or contumely, or malice").

## III.   State Farm's Reply.

State Farm maintains that Davis' Response wholly misunderstands and/or misapplies its principal argument supporting summary judgment on the conversion claim.  State Farm does not dispute that voidable title was passed from Adams to the perpetrator.  Instead, State Farm argues, the voidable title held by the perpetrator was voided before the perpetrator "sold" the truck to Davis.  Because Davis received void title from the perpetrator, State Farm concludes, he is not entitled to enjoy the protections provided by Alabama Code § 7-2-403 (1975).

State Farm sets forth the following time line of events:

- •    February 26, 2004:    Adams sells the truck to the perpetrator.[17]  The perpetrator pays for the truck using an apparent cashier's check.

- •    March 3, 2004:    Adams learns that the cashier's check was a fraudulent instrument.  Adams notifies the Montevallo Police Department of the theft.

- •    March 8, 2004:    The perpetrator sells the truck to Davis.

According to State Farm, it agrees with Davis that voidable title was passed from Adams to the perpetrator on February 26, 2004.  *See* Ala. Code § 7-2-403(1) (1975).  *See also Hodges*

---

[17] State Farm addresses Davis' contentions that Adams violated the Alabama Uniform Certificate of Title and Antitheft Act.  According to State Farm, as Adams is not a party to this action, whether he violated the Act is inconsequential.  State Farm maintains that, aside from the facts surrounding (1) Adams' sale of the truck to the perpetrator in exchange for a fraudulent instrument, and (2) Adams' reporting of the theft to the authorities, Adams' actions during the theft bear no relevance to the dispute between Davis and State Farm.

25

*Wholesale Cars v. Auto Dealer's Exchange of Birmingham,* 628 So.2d 608, 610 (Ala. 1993).

However, State Farm contends, the perpetrator's voidable title was voided upon Adams' report of

the theft to the Montevallo Police Department on March 3, 2004.  *See* Ala. Code § 32-8-84(e)

(1975) (stating, "[t]he department may suspend the registration of a vehicle whose theft or

conversion is reported to it pursuant to this section; until the department learns of its recovery or

that the report of its theft or conversion was erroneous, it shall not issue a certificate of title for

the vehicle"); *B.R.L. Equipment Rentals Ltd. v. Seabring Marine Industries, Inc.*, 168 F.3d 413,

416 (11th Cir. 1999) (discussing determination of whether voidable title has been voided).

Therefore, State Farm concludes, the perpetrator passed void title, not voidable title, to Davis on

March 8, 2004.

State Farm disputes Davis' reliance on *Hodges Wholesale Cars v. Auto Dealer's

Exchange of Birmingham*, 628 So.2d 608 (Ala. 1993).  State Farm argues that the *Hodges* court

did not address facts identical to those in this case.  According to State Farm, *Hodges* did not

involve any intervening facts that voided the voidable title.  Here, State Farm contends, Adams'

March 3, 2004 report of the theft to the Montevallo Police Department rendered the perpetrator's

title to the truck void, and foreclosed the applicability of *Hodges* to events occurring after March

3, 2004.  After that date, State Farm asserts, the perpetrator no longer held voidable title on the

truck, and *Hodges* ceased to protect subsequent purchasers, good faith or otherwise.[18]

## CONCLUSIONS OF THE COURT

---

[18] Given that the perpetrator held void title to the truck when he transferred it to Davis,
State Farm argues that there is no need to evaluate whether Davis was a good faith purchaser.
However, State Farm maintains, the evidence clearly negates any arguments that Davis bought
the truck in good faith.

Pursuant to plaintiff's Response to Defendant State Farm's Motion to Dismiss Municipal Defendants, all claims against defendants Dwight Lawrence, Chad Miller, and the City of Albertville, Alabama will be dismissed with prejudice.  Further, plaintiff's § 1983 claim against State Farm will be dismissed with prejudice.

The court will also dismiss the outrage claim.  The actions alleged here do not fall within the parameters of any type of outrage claim recognized by the Supreme Court of Alabama.  The only remaining cause of action in this case is plaintiff's claim against State Farm for conversion. Plaintiff's ability to recover on his conversion claim initially turns upon the issue of whether he held good title to the truck when it was seized on March 29, 2004 at the direction of State Farm.

The court will not further repeat the parties' arguments regarding the conversion claim. The court initially concludes that there is a question of fact for a jury as to whether Davis acted in good faith in purchasing the vehicle.

The further issue as to whether Davis' voidable title was rendered void by Adams' report of the vehicle theft to the Montevallo Police Department is partly a question of fact and partly a question of law.  The issues include: (1) whether the "peace officer" knew or had reason to know that a theft or conversion had previously been reported to the Department of Revenue; (2) whether and when the Montevallo Police Department or anyone reported the alleged theft to the Department of Revenue; (3) whether the Department of Revenue ever became legally obligated to suspend registration of the vehicle; and (4) whether § 32-8-49, Code of Alabama, has any application.

There may well have to be expert evidence related to the operations of the Department of Revenue and the status of the title.  While it is highly doubtful that the evidence will support any

claim for punitive damages, the court cannot, at this stage, definitively determine that there is no genuine issue of fact or law related to the conversion claim.  The Motion as to that claim will be denied.

This 20th of July, 2005.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**